IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GERALDINE HOLTS,                          )
and MARY BETH HEAVERLEY,                   )
                                          )
              Plaintiffs,                  )
                                          )        Civil Action No. 07-552
                                          )
       vs.                                 )
                                          )
                                          )
CITIZENS BANK of PENNSYLVANIA, INC.,       )
t/d/b/a CITIZENS BANK, a subsidiary of     )
CITIZENS FINANCIAL GROUP, INC.,            )
and CITIZENS FINANCIAL GROUP, INC.,        )
                                          )
              Defendants.                  )

## MEMORANDUM OPINION

CONTI, District Judge.

Pending before this court is a motion for summary judgment (Doc. No. 25) filed by

defendants Citizens Bank of Pennsylvania and Citizens Financial Group, Inc. ("defendants" or

"Citizens").  Plaintiffs Geraldine Holts ("Holts") and Mary Beth Heaverley ("Heaverley" and

together with Holts "plaintiffs") filed this civil action asserting age and sex discrimination

claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"),

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the

Pennsylvania Human Relations Act, 43 PA. CONS. STAT. §§951 *et seq.* ("PHRA").[1]  Plaintiffs

---

[1] PHRA claims are treated consistently with claims brought under federal anti-discrimination statutes.  In an ADEA case, the United States Court of Appeals for the Third Circuit held "that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something explicitly different in its language requiring that it be treated differently. "  Fogelman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002).  Neither party argues

initially filed these claims with the Equal Employment Opportunity Commission ("EEOC"), and cross-filed with the Pennsylvania Human Rights Commission ("PHRC").  Both plaintiffs exhausted their administrative remedies.

For the reasons set forth below, the court will grant defendants' motion for summary judgment.

### Factual Background

Citizens Bank of Pennsylvania, Inc. was formed in 2001 in connection with the December 2001 acquisition by Citizens Financial Group, Inc. of the retail and commercial banking operations of Mellon Bank, N.A. ("Mellon").  (Joint Statement of Material Facts ("JS") ¶ 1.)  Following its acquisition of Mellon's retail banking operations, Citizens became more proactive than Mellon had been in setting goals and objectives for and measuring the performance of its branch offices.  (JS ¶ 6.)  Goals were set at the corporate level, but Craig Campbell ("Campbell"), the regional director for western Pennsylvania during the time in question, allowed his regional managers to redistribute their goals slightly between their branches.  (Pls.' App. Ex. 13, at 26-27.)

Following the merger and Citizens' imposition of more aggressive sales goals, the employees who carried over from Mellon had concerns regarding whether they would be able to meet their new goals and survive under Citizens' regime.  (Defs.' App. Ex. 7, at 17-18.)  At a meeting in 2002 or 2003, Regional Director Richard Hymanson ("Hymanson") allegedly said that about one-third of the branch managers present would not be there in a few years and that "there were younger people waiting in the wings for their positions."  (JS ¶ 12.) Citizens disputes

---

here that the PHRA requires a different analysis.

this statement.  (Id.)  Hymanson was replaced in the regional director position in November 2002

and Campbell eventually assumed that position in November 2003.  (Defs.' App. Ex. 2 ¶¶ 9,10.)

 Citizens evaluates its employees annually based upon their particular job functions and

performance objectives.  (JS ¶ 7.)  Employees may also receive periodic performance

evaluations on a quarterly basis.  (Id.)  In each category, employees are rated on a scale of one

through five, with one being the highest rating.  (Id.)  For employees who fail to perform at a

satisfactory level, Citizens implements a progressive discipline and performance improvement

process.  (Id. ¶ 8.)  The first step is an oral discussion between the employee and his or her

immediate supervisor.  (Id.)  If this does not lead to an improvement, the employee receives a

written warning and a written performance improvement plan.  (Id.)  If the employee fails to

meet all expectations during the performance improvement plan period, an employee may be

terminated.  (Id.)  Generally, termination is preceded by a final written warning notice to the

employee.  (Id.)

 Campbell was placed on a performance improvement plan that required him to increase

the performance of branch operations in the western Pennsylvania area during the 2005 calendar

year.  (Id. ¶ 9.)  In furtherance of his performance improvement plan and as the supervisor of the

regional managers, Campbell worked with the human resources department to develop a list of

branch managers who should be on corrective action because their branches were not meeting

performance goals.  (Defs.' App. Ex. 1, Blyth Dec. Ex. C.)  The list included the managers of the

bottom fifty percent performing branches, minus managers who were on target for three or more

goals, new to their positions, or had other significant mitigating circumstances.  (Id.)  The list

included Holts as well as David Zebrowski ("Zebrowski"), who supervised Heaverley (Id.)

In May 2005, Barbara Blyth ("Blyth"), the human resources director for western Pennsylvania, sent an email to various decision makers containing a list of all the branch managers in the region managed by Reid Segar ("Segar").  (JS ¶ 12.)  The list included the ages of the branch managers in the right-hand column.  (Id.)  Campbell, who likely saw the list at the time it was circulated, admitted in his deposition that though he did not recall seeing it, he would have thought the inclusion of the age column to be "alarming."  (Pls.' App. Ex. 13, at 87.)  Among the branch managers on the list were Holts and Donna Senko, who was discharged in October 2005.  (JS ¶ 12.)  Two of the four other branch managers on the list were no longer with Citizens by the end of 2005.  (Pls.' App. Ex. 13, at 105-06.)

**Facts concerning Holts**

Holts was employed by Mellon for more than twenty-five years, consistently meeting or exceeding the performance standards set by Mellon.  She was promoted to the position of branch manager at the Fourth and Main office in Greensburg, Pennsylvania ("Fourth and Main Branch") in 1992 and given the title of assistant vice president in 2002.  (Compl. ¶ 15.)  She became a Citizens' employee following the merger in 2001.  (Id. ¶ 16.)

Shortly after assuming the regional manager position in March, 2005, Segar visited the Fourth and Main Branch and met with Holts and other branch employees.  (JS ¶¶ 10-11.)  According to Holts' deposition, Segar made negative comments about Holts' computer skills and those of other older employees in comparison to Citizens' younger employees, although he did not specifically comment about the ages of the older employees.  (Defs.' App. Ex. 7, 25.)  Segar visited the branch on at least one other occasion before April 18, 2005. During this visit, he

4

questioned branch employees about Holts' performance as branch manager while she was out of the office.  (JS ¶ 11.)

On April 18, 2005, Segar again visited the Fourth and Main Branch and presented Holts with a development plan, which set forth computer, organizational, and operational areas in which Segar wanted Holts to develop her skills.  (Id. ¶ 12; Defs.' App. Ex. 20.)  This development plan was not part of Citizens' formal disciplinary process.  (JS ¶ 13.)

On June 20, 2005, Segar presented Holts with a verbal warning, the first step of Citizens' disciplinary process.  (Id.)  The warning listed the areas where Citizens alleges Holts' job performance was less than satisfactory, including failure to meet sales goals for her branch, tardiness, failure to attend conference calls, sleeping during meetings, failure to coach her staff, lack of organization, and failure to meet deadlines.  (Id.)  Holts disputes these allegations and claims that her sales goals were unrealistically high.  (Id.)  Holts claims that she was late for conference calls because Segar scheduled them for 9:00 a.m., when the branch was just opening and she would often be talking with a customer, and because she encountered some technical difficulties in dialing in to conference calls.  (Id.)  Holts claims that she was not late to a training meeting; rather, the meeting started early.  (Id.)  With respect to her failure to meet deadlines, Holts alleges that Segar failed to give her necessary instructions to submit certain work correctly on time.  (Id.)  Holts denies sleeping during any meetings and claims that a representative from human resources agreed to remove from her review the deficiencies with respect to tardiness, inability to meet deadlines, and unsatisfactory comprehension of the job.  (Id.)

For the quarter that ended on June 30, 2005, the Fourth and Main branch failed to meet any of its five performance objectives: consumer and business checking accounts, loans,

investments, and deposit growth.  (Id. ¶ 14.)  It was during this quarter that the goals for the

Fourth and Main branch were dramatically increased.  (Id.)  On August 29, 2005, after not seeing

a significant improvement in Holts' performance, Segar gave Holts a written warning.  (Id. ¶ 17.)

In mid-September 2005, Holts visited Blyth's office in Pittsburgh, Pennsylvania.  (Id. ¶

18.)  Holts asked to be transferred to another position within Citizens because she did not want

to continue to work under Segar.  (Defs.' App. Ex. 7, 53.)  Blyth offered her an assistant

manager position at the Eaton Road branch without a reduction in salary, which Holts eventually

accepted effective November 7, 2005.  (JS ¶ 18.)  She was replaced as branch manager at the

Fourth and Main branch by Ronald Tufts, a thirty-eight-year-old male.  (Defs.' App. Ex. 6 ¶ 24.)

Citizens issued Holts a final written warning on February 10, 2006, based upon

allegations of lack of familiarity with account processing, lack of organizational skills, and

excessive tardiness.  (JS ¶¶ 20-21.)  Holts denies the tardiness allegation, claiming that there was

a miscommunication about the time she was expected to arrive at work.  (Id.)  The warning gave

her ninety days during which she had to avoid tardiness to business meetings and required her to

show improvement in the other areas within thirty days or face termination.  (Defs.' App. Ex.

26.)  Holts was not subject to any further disciplinary action following the final written warning

and her supervisor noticed some improvements in her performance.  (JS ¶¶ 22-23.)

Seven months following the final written warning in September 2006, Holts resigned her

position with Citizens to accept a position as a branch manager with PNC Bank at a salary of

$50,000, approximately $7,000 to $8,000 more than she was paid by Citizens.  (Id. ¶ 24.)  She

was fifty-seven years old at that time.  (Compl. ¶ 30.)  Holts duties were assumed by an

individual who was less than forty years old and male.  (Id.)

**Facts concerning Heaverley**

Heaverley was employed as a banking sales specialist ("BSS") for over twenty years in Citizens' Norwin branch with responsibility for sales of financial products and services to consumer and business customers.  (Id. ¶ 25.)  She was fifty-one years old at the time of her termination, and prior to 2004 consistently met her sales goals and was not subject to disciplinary action.  (Compl. ¶¶ 73, 79.)  Zebrowski became Heaverley's immediate supervisor in early 2004 and observed several performance deficiencies, including taking too long to process customer transactions, tardiness, excessive personal phone calls, and passiveness that caused her to fail in meeting her sales goals.  (JS ¶¶ 28,30.)

Heaverley denies these allegations, citing her July 2004 quarterly performance evaluation that gave her an overall performance score of seventy out of one hundred, with a score of seventy or above being "on target."  (Id. ¶¶ 30, 31; Defs.' App. Ex. 32.)  Heaverley asserts that she spent a long time getting to know her customers because she believed that getting to know them was good for business.  (JS ¶ 30.)  She denies that she was frequently late to work and claims that she often worked later than other employees.  (Id.)  Although she admits that her lunch times were inconsistent, she claims this was because she would find herself with a customer when her lunch time started and she would wait to take lunch until she was finished with the customer.  (Id.)  Heaverley denies making personal phone calls from work on a regular basis, except for a short call each afternoon to confirm that her daughter had arrived home safely from school.  (Id.)  She counters Citizens' accusation that she was too passive in bringing in new customers by highlighting an effort she made to generate business by visiting a local shut-in at

7

her home.  (Id.)  She claims that she was unable to schedule a meeting with another employee as directed by Zebrowski to create a plan for visiting customers.  (Id.)

On August 13, 2004, Heaverley was issued a verbal warning for her lack of sales results. (Defs.' App. Ex. 31.)  Heaverley demonstrated some improvement in performance, meeting her investment goals for the third and fourth quarters of 2004 and coming closer to meeting her other goals than she had in the past.  (Id. ¶ 33.)  She received an overall rating of four ("meets some expectations") on her annual performance review in March 2005.  (Id. ¶ 34.)

In response to Heaverley's sales declining again during the first and second quarters of 2005, Zebrowski provided her with a written warning on August 12, 2005, which warned that she had thirty days to improve her performance or further corrective action would occur.  (Id. ¶ 35.)  Attached to the warning was an action plan that included weekly sales goals for the upcoming thirty-day period.  (Id.)

Heaverley failed to meet any of her sales goals following her written warning, and Zebrowski issued her a final written warning on September 12, 2005.  (Id. ¶¶ 36, 37.)  Zebrowski provided an action plan with specific goals for Heaverley to achieve within a thirty-day period. (Id. ¶ 37.)  The goals set for Heaverley in this action plan were significantly higher than those set in the action plan that accompanied her August 12, 2005 written warning; the higher goals were explained to result from her lack of performance during the prior thirty days.  (Defs.' App. Exs. 38, 39.)  Heatherly did not meet these goals and was terminated on October 12, 2005.  (JS ¶¶ 38, 39.)

Heaverley alleges that she failed to meet her sales goals because Zebrowski did not respond to her complaints about several issues that prevented her from being credited for all her

sales.  (JS ¶¶ 25,31,35).  First, Lesher was allowed to enforce a policy that if a customer came into the branch and spoke with Lesher on one occasion and then returned to conduct a transaction, Lesher would receive credit even if another employee, i.e., Heaverley, handled the transaction.  (Id. ¶¶ 25,31.)  Heaverley opened a number of accounts on Zebrowski's computer due to an unresolved problem with her computer, but Zebrowski never credited Heaverley for these accounts despite promising to do so.  (Id. ¶ 35.)

Heaverley felt that she did not receive adequate training on Citizens' investment products ethically to sell them.  (Id.)  Since she was no longer able to sell Mellon's mutual fund products, she instead referred customers seeking investments to the financial consultant.  (Id.)  When she expressed her concerns about this situation to Regional Manager Ryan Kraynik, he told her to concentrate on selling Citizens' life insurance products, which Heaverley refused to sell because she believed they were inferior.  (Id.)  This situation eventually caused Heaverley's title to be changed from BSS to sales and service representative ("SSR") (with no reduction in salary) sometime between August and September 2005 so that she would no longer be primarily responsible for investments.  (Id. ¶ 35; Defs.' App. Ex. 37.)

Citizens did not hire a new BSS for the Norwin branch.  (Defs.' App. Ex. 6 ¶ 24.)  Instead, Citizens transferred another SSR, Colleen Dull, to the Norwin branch on January 30, 2006 to take over many of Heaverley's duties.  (Id.)  Ms. Dull was twenty-two years old at the time.  (Id.)  Some of Heaverley's duties were assumed by Grace Lesher ("Lesher"), an existing SSR, who was fifty-five years old.  (Id.)

**Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all reasonable inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated only if there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining whether a dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 249.

**Discussion**

I.  ADEA

    A.  ADEA - General Framework

The ADEA prohibits an employer from discharging or discriminating against any individual employee on the basis of the employee's age if the employee is forty years old or older.  29 U.S.C. §§ 623(a), 631(a).  Employment discrimination claims filed under the ADEA are analyzed under the burden-shifting framework originally established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and clarified in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  Under this framework, the plaintiff first must meet four elements to establish a prima facie case of employment discrimination: (i) the plaintiff was a member of a

class protected by statute; (ii) she was otherwise qualified for her position; (iii) she suffered an

adverse employment action; and (iv) the adverse action was suffered under circumstances that

raise an inference of discriminatory motive on the part of the employer.  Sarullo v. U.S. Postal

Serv., 352 F.3d 789, 797-98 (3d Cir. 2003) (citing McDonnell Douglas, 411 U.S. at 802).  The

fourth element is usually met by showing evidence that the plaintiff was dismissed in favor of an

individual outside the protected class, although other circumstances can be used to show an

inference of discriminatory motive.  Id.

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to

show a legitimate, nondiscriminatory reason for the adverse employment action.  Simpson v.

Kay Jewelers Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998) (citing St. Mary's

Honor Center v. Hicks, 509 U.S. 502, 506 (1993)).  This burden is "relatively light" because the

employer does not need to prove that its proffered nondiscriminatory reason was the actual

reason for the adverse employment action.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

The burden then shifts back to the plaintiff to prove by a preponderance of the evidence

that the legitimate reasons offered by the defendant were a pretext for discrimination.  Id.  At

trial, the plaintiff must convince the fact finder not only that the defendant's reasons were false,

but also that discrimination was the real reason.  Id. (citing Hicks, 509 U.S. at 515).  To

withstand a defendant's motion for summary judgment, the court of appeals in Fuentes

considered two prongs to determine whether pretext was shown.  The plaintiff must show direct

or circumstantial evidence by which a reasonable fact finder could *either* (i) disbelieve the

employer's stated nondiscriminatory reason *or* (ii) believe that discrimination was more likely

than not the cause of the adverse action against the employee.  Id. at 764.

11

In order to satisfy the first prong, that a reasonable fact finder could disbelieve the employer's stated nondiscriminatory reason, the plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in the employer's proffered legitimate, nondiscriminatory reasons such that a reasonable fact finder could find them "unworthy of credence" and infer that they did not actually motivate the adverse action.  Id. at 765 (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

To satisfy the second Fuentes prong, that a reasonable fact finder could believe discrimination was more likely than not the cause of the adverse action against the employee, the plaintiff must show evidence from which a reasonable fact finder could believe a discriminatory motive, rather than the defendants' proffered reasons, was the true reason for her termination. Under Fuentes, there are three factors that can be used to show a discriminatory motive: (i) evidence that the employee has in the past been subjected to discriminatory treatment by the employer, (ii) evidence that the employer treated other, similarly situated persons not of the plaintiff's protected class more favorably, or (iii) evidence that the employer has discriminated against other members of the protected class or other protected classes.  Id.

## B.  Holts' Age Discrimination Claim

### 1. Prima Facie Case

Plaintiff Holts is able to satisfy the first, second and fourth elements of a prima facie case of age discrimination.  The first element of the prima facie case is that she must be within the class protected by the ADEA and PHRA.  At the age of fifty-seven, she meets this requirement. With respect to the second element, she must have been reasonably qualified for the position.  It

is undisputed that she meets this requirement with her long career as a branch manager for Citizens/Mellon and her history of positive reviews.  Since Holts was replaced by a male younger than forty, she is able to meet the final element of the prima facie case – that the dismissal occurred under circumstances that create an inference of discrimination.

The crux of the issue lies with the third element – whether Holts was subject to an adverse employment action.  Holts states that she was constructively demoted and then constructively discharged.  The United States Court of Appeals for the Third Circuit has held that an employee is protected from a calculated effort to pressure her into resignation through the imposition of unreasonably harsh conditions in excess of those faced by her coworkers.  Gray v. York Newspapers, 957 F.2d 1070, 1083 (3d Cir. 1992).  In order to prevail on a constructive discharge claim, the employee must show that a reasonable person in the employee's position would have resigned in similar circumstances.  Id. (citing Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir. 1984)).

Holts claims that her termination was inevitable because the sales goals were unattainable and under the terms of her performance improvement plans, she was required to meet her sales goals or be terminated.  She contends it is reasonable that she chose to request a transfer and then resign after the transfer failed to remedy her situation.  She, however, adduced no evidence that her sales goals were higher than those of similarly situated employees, a key element of the Gray standard.  She left her employment with Citizens seven months after she received a final written warning from Citizens. Since her warning threatened termination if she did not show improvement within thirty to ninety days and because her supervisors noticed

13

improvement in her performance, she was, at the time of her resignation, no longer at imminent risk for termination.

     The question whether a negative performance review can be an adverse employment action as a matter of law has been addressed by the Court of Appeals for the Third Circuit.  In Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1161 (3d Cir. 1993),  the court of appeals acknowledged that while the plaintiff was not the victim of constructive discharge merely because her supervisor was carefully scrutinizing her performance, unsatisfactory performance evaluations can be a factor in determining constructive discharge claims.  The court cautioned that this factor should be applied narrowly lest employers be afraid to enforce high employee standards.  Id. at 1162.

     In order for a negative performance review to constitute constructive discharge, the circumstances must be severe.  See Reganick v. Southwestern Veterans Ctr., Civ. No. 06-1267, 2008 WL 768423 (W.D. Pa. Mar. 20, 2008) (disciplinary conference held with plaintiff insufficient to establish adverse employment action); Nagel v. RMA, 513 F.Supp.2d 383,391 (E.D. Pa. 2007) (hour-long "heated meeting" with supervisor during which performance criticisms were made was insufficient to constitute adverse employment action).  In the instant case, as in Reganick and Nagel, the negative performance reviews did not constitute an imminent and insurmountable threat of termination, such that a reasonable employee would seek employment elsewhere.  Subjective beliefs are not sufficient.  See Reganick, 2008 WL 768423, at *21; Nagel, 513 F.Supp.2d at 391.  The court of appeals has noted:

> "[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure h[er] into resignation through the imposition

14

> of unreasonably harsh conditions, in excess of those faced by h[er] co-workers.
> [Sh]e is not, however, guaranteed a working environment free of stress. The
> employment discrimination laws require as an absolute precondition to suit that
> some adverse employment action have occurred. They cannot be transformed into
> a palliative for every workplace grievance, real or imagined, by the simple
> expedient of quitting."

Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992) (quoting Bristow v. Daily

Press, Inc., 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082 (1986)).

Holts was given her final written warning on February 10, 2006. She was given thirty

days to improve on some of her goals, and ninety days to improve on others. There is no

evidence of any further disciplinary action, unattainable goals, or unreasonably harsh working

conditions. Holts was successful in improving her performance to at least a minimally

satisfactory level. By May 2006, Holts was no longer in a position where she faced imminent

termination for failure to meet her goals. By September 2006 Holts successfully completed

seven months following the final written warning without incident or evidence of harsh working

conditions. Holts resigned her position with Citizens in September 2006 to accept a position as a

branch manager with PNC Bank making 14-16% more than she made at Citizens. Under these

circumstances, with no showing that other similarly situated employees had lesser sales goals, a

reasonable jury could not find that Holts was constructively discharged from her employment

with Citizens. She is unable to establish an adverse employment action - the third element - of

the prima facie case for employment discrimination. Holts' age discrimination claim cannot

survive summary judgment because no reasonable jury could find she satisfied the third element

of a prima facie case for age discrimination under the ADEA.

**C.  Heaverley ADEA Claim**

    **1. Prima Facie Case**

    Heaverley presented sufficient evidence to establish a prima facie case for age discrimination under the ADEA.  First, she was a member of the protected class at the time of her termination at age fifty-one.  Next, she must have been qualified for her position.  Heaverley satisfies this element because she had over twenty years of service for Citizens/Mellon without negative performance reviews.  Next, she must have been subject to an adverse employment action, which is undisputed because she was involuntarily terminated.  Last, the adverse employment action must have occurred under circumstances that create an inference of discrimination.  Although Citizens did not replace Heaverley in the BSS position, Citizens hired a new SSR to assume many of her duties.  The new SSR was twenty-two years old, which raises an inference of a discriminatory motive.

**2. Legitimate, Nondiscriminatory Reason**

    The burden now shifts to the defendant to show a legitimate, nondiscriminatory reason for Heaverley's termination.  Citizens claims that Heaverley was terminated for failing to meet

sales goals.[2]  This reasons is sufficient to assert the light burden of showing a legitimate, nondiscriminatory reason.

### 3. Whether Defendants' Stated Reason is Pretextual

In order to prevail against Citizens' motion for summary judgment, Heaverley must satisfy either prong of the Fuentes analysis by adducing sufficient direct or circumstantial evidence for a reasonable fact finder to either (i) disbelieve Citizens' stated nondiscriminatory reason or (ii) believe that discrimination was more likely than not the cause of her termination.

(a) First Prong

Heaverley could satisfy the first prong by pointing to "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in Citizens' proffered legitimate, nondiscriminatory reason such that a reasonable fact finder could find them "unworthy of credence" and infer that it did not actually motivate her termination.  Heaverley did not dispute that she failed to meet her sales goals, but she argues that her sales goals were set unrealistically high, and there was no way she could meet them.  Heaverley did not, however, adduce any

---

[2]In his deposition and statement, Zebrowski noted several "general deficiencies" with respect to Heaverley's job performance in addition to her failure to meet sales goals, including: taking too long to process customer transactions, tardiness, excessive personal phone calls, and passive salesmanship.  None of these cited deficiencies, however, were asserted by defendant as a legitimate, nondiscriminatory reason for Heaverley's termination.  The written warning issued on  August 12, 2005, listed as the only reason for the notice a **lack of sales results** (emphasis in original).  (Def.'s App. Ex. 4, at 0393.)  Likewise, the final written warning issued on September 12, 2005, listed as the sole reason for the notice a **lack of sales results** (emphasis in original). (Id. at 0380.)  Defendant answered in response to interrogatories: "The employment of Mary Beth Heaverley was terminated because of her poor sales results, unsatisfactory performance, and failure to demonstrate any significant improvement in performance following her receipt of numerous verbal and written warnings, counselings, and other corrective action." (Def.'s App. Ex. 6, at 11.)  These deficiencies relate to Heaverley's inability to meet her sales goals, which was the sole reason identified for her termination.  The lack of sales results is defendant's proferred legitimate, nondiscriminatory reason for Heaverley's termination.

evidence to show that her goals were higher than anyone other SRRs.  Heaverley offered several explanations for why she failed to meet her sales goals.  Heaverley claimed that Lesher poached some of her customers and that she was not given credit for accounts that she opened on Zebrowski's computer.  Heaverley, however, failed to present evidence that had these factors been mitigated, she would have met her goals.  Heaverley also cited her lack of training and unfamiliarity with some of the instruments she was asked to sell.   Heaverley did not show how her lack of training shows pretext.  She did not claim that other employees were favored and received better training.  Heaverley did not proffer any evidence that younger employees in her position had lower goals or that other similarly situated employees were not disciplined for failing to meet their sales goals.  Under those circumstances, a reasonable finder of fact could not find Citizens' proffered reason - lack of sales results - to be "unworthy of credence" and infer that discrimination was the true motive.  It has long been understood that the courts do not serve as a "super-personnel department," and that it is not their role to reexamine a litigant's business decisions.  Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995). The inquiry is to whether Citizens gave an honest explanation of its behavior such that there can be no inference of discrimination, not whether Citizens' behavior was generally fair to Heaverley. Id. at 332.

(b) Second prong

Heaverley could also defeat Citizens' motion for summary judgment under the second Fuentes prong by adducing sufficient evidence for a reasonable fact finder to believe that a discriminatory motive, rather than the defendant's proffered reasons, was the true reason for her termination.  To do this, Heaverley must satisfy at least one of three factors: (i) evidence that the

18

employee has in the past been subjected to discriminatory treatment by the employer, (ii)

evidence that the employer treated other, similarly situated persons not of the plaintiff's

protected class more favorably, or (iii) evidence that the employer has discriminated against

other members of the protected class or other protected classes.

(i)  Evidence of past discriminatory treatment

Heaverley fails under the first factor because she did not present evidence that she was

discriminated against by Citizens or Mellon prior to the events in dispute in the instant case.

(ii) Similarly situated individuals

She did not adduce sufficient evidence to prevail under the second factor because hiring a

younger person than her is not sufficient standing alone to prove that Citizens treated  more

favorably other, similarly situated younger employees.  The treatment of a single employee

"cannot be viewed in a vacuum" to demonstrate a trend of discrimination.  Simpson, 142 F.3d at

645-46.  Heaverley did not present evidence that younger employees were given lower sales

goals or that younger individuals who did not meet their sales goals were not terminated.  It is

noteworthy that some of Heaverley's responsibilities were assumed by Lesher, who is older than

Heaverley.

(iii) Discrimination against other employees in protected class

Heaverley failed to produce sufficient evidence to satisfy the third Fuentes factor -

discrimination against other employees in the class protected by the ADEA or other protected

classes.  While the list of branch managers by age sent by email demonstrates that at least some

of the individuals at Citizens responsible for terminating Heaverley were conscious of the ages

19

of certain employees, there is no evidence that the list was used for the purposes of discrimination.

Heaverley alleges that one person who was on the list and in the protected class, Donna Senko, was terminated and that three of the five others who are in the protected class and on the list (including Holts) were no longer with Citizens by the end of 2005. (Pls.' App. Ex. 13, at 105-06.) But without evidence showing that these employees were discriminated against, a reasonable fact finder could not believe that this list alone demonstrates that Citizens was discriminating against older employees in western Pennsylvania during the time in question.

Heaverley also points to the comments made by Hymanson in 2002 or 2003 that younger employees were "waiting in the wings" to fill the positions of older, former Mellon employees as evidence that discrimination was the real reason for the constructive action against her under the third factor of the Fuentes analysis: that Citizens had discriminated against other employees. These remarks, however, have limited weight because of the temporal distance from the alleged remarks made in 2002 or 2003 and her termination in October 2005, and because Hymanson had no role in those decisions. Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992), *cert. denied*, 510 U.S. 826 (1993) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) ("Stray remarks by non-decision makers or by decision makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.")). Nonetheless, a fact finder could give it some small amount of weight in context with other evidence to show that Citizens had a discriminatory motive towards its older employees. Because Heaverley failed to present other

sufficient evidence of a discriminatory purpose, Hymanson's statements alone could not show that Citizens was discriminating against other employees.

Heaverley failed to adduce evidence from which a reasonable fact finder could believe either that Citizens' proffered reason for terminating her was false or that discrimination was more likely than not the true reason for her termination.  Under those circumstances, her ADEA claim cannot survive defendants' motion for summary judgment.

## II. Gender Discrimination

Defendant seeks summary judgment with respect to plaintiffs' gender discrimination claims arguing that plaintiffs have not adduced any evidence in support of their gender discrimination claims.  Plaintiffs made generalized allegations of gender discrimination in the complaint, but  they did not adduce any evidence of record to support those claims, and did not provide legal or factual argument in support of the claims.  Rule 56 (e)(2) of the   Federal Rules of Civil Procedure provides**:**

> ***Opposing Party's Obligation to Respond.*** When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Plaintiffs did not meet this obligation with respect to their gender discrimination claims. Summary judgment will be granted in favor of defendants on plaintiffs' gender discrimination claims.

## Conclusion

For the reasons set forth above, the court will grant defendant's motion for summary

judgment.

By the court,

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated:   September 4, 2009